# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

----------------------------------------------------x

In re                                                          :          Chapter 15
                                                               :
Altos Hornos de México, S.A.B. de C.V.[1],   :          Case No. 16-11890 (      )
                                                               :
     Debtor in a Foreign Proceeding.        :

----------------------------------------------------x

## DECLARATION OF FRANCISCO JAVIER GAXIOLA FERNÁNDEZ
## IN SUPPORT OF CHAPTER 15 PETITION AND FIRST DAY PLEADINGS

I, Francisco Javier Gaxiola Fernández, declare as follows:

1.      I am the duly appointed, proposed foreign representative (the "Foreign Representative") of the above-captioned debtor (the "Debtor" or "AHMSA") in a proceeding (the "SP Proceeding") under Mexico's Bankruptcy and Suspension of Payments law (the "SP Law"),[2] pending before the First Civil Court of First Instance for the Judicial District of Monclova, Coahuila, Mexico (the "Mexican Court").  I am fully authorized to act on behalf of the Debtor in this chapter 15 proceeding (this "Chapter 15 Case").

2.      I submit this declaration in support of: (a) the official form chapter 15 petition of the Debtor (the "Chapter 15 Petition"); (b) the *Verified Petition for (I) Recognition of Foreign Main Proceeding;(II) Enforcement of Lifting Order; and (III) Certain Related Relief* (the "Verified Petition"); (c) the *Motion for an Order Granting Provisional Relief* (the "Provisional Relief Motion"); and (d) the *Motion for Entry of an Order Scheduling Hearing and*

---

[1]    The last four digits of the Debtor's U.S. and Mexican taxpayer identification numbers are 0706 and 6U10, respectively. The Debtor's executive headquarters are located at Prolongación Juarez s/n, Col. La Loma, Monclova, Coahuila, Mexico, 25770.

[2]    In 2000, after the commencement of the SP Proceeding, the SP Law was superseded by the *Ley de Concurso Mercantiles* (the "Concurso").  Pursuant to applicable Mexican law, the SP Proceeding continues under the SP Law notwithstanding the enactment of the Concurso.  See Transitional Article 5 of Concurso.

*Specifying Form and Manner of Service and Publication of Notice* (the "Notice Procedures Motion").

3.     In 1999, I was appointed by the Mexican Court to serve as the "*síndico*" in the Debtor's SP Proceeding, and in that role, I have been involved in the restructuring of the Debtor's business and the negotiation and implementation of the Mexican Plan (as defined further below).  As a result of (i) my role as *síndico* in the SP Proceeding, and (ii) through discussions I have had with the Debtor's officers, managers and advisors in preparation for this Chapter 15 Case, I have become familiar with its day-to-day operations, assets, financial condition, business affairs and books and records.   Except as otherwise indicated, all facts set forth in this Declaration are based upon:  (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by officers, directors and employees of the Debtor or other professionals retained by the Debtor, including, with respect to matters of United States bankruptcy law, information provided to me by U.S. counsel; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

4.     I am an individual over the age of eighteen and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.     The Debtor filed for protection under the SP Law on May 24, 1999.[3]  On May 25, 1999 (the "SP Commencement Date"), the Mexican Court entered an order commencing the SP Proceeding (the "SP Commencement Order"),[4] which granted a stay of creditor actions for the benefit of the Debtor, halted the accrual of interest on all outstanding

---

[3]     Three of the Debtor's affiliates also filed for protection under the SP Law, but they previously emerged from protection under the SP Law in 2006 and 2008, and will not be filing petitions for relief under chapter 15 of the Bankruptcy Code.

[4]     A certified copy of the SP Commencement Order in its native Spanish is attached hereto as Exhibit A.  A certified English translation of the SP Commencement Order is attached hereto as Exhibit B.

unsecured debt, and converted all obligations denominated in a currency other than Mexican pesos into Mexican pesos.

6.      On May 16, 2016, the Mexican Court entered an order (the "Lifting Order")[5] approving the Debtor's General Payment Agreement (the "Mexican Plan")[6] and lifting the Debtor's suspension of payments.  The Lifting Order expressly authorized the Debtor to file for relief under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtor caused notice of the Lifting Order to be published in the *Diario Oficial de la Federación* from July 6 through July 8, 2016.

## BACKGROUND

**I.      *The Debtor's Business***

7.      The Debtor is one of the largest integrated steel producer in Mexico and is engaged in the manufacture and distribution of steel and steam coal products.  The Debtor's steel segment manufactures steel products through an integrated process, beginning primarily with internal sources of metallurgical coal and iron ore for use in steel production and ending with the distribution and sale of the Debtor's finished products.  The steam coal segment extracts and sells steam coal used by the Comisión Federal de Electricidad ("CFE"), Mexico's state-owned electric commission, to generate electrical energy and metallurgical coal and iron ore for use in the Debtor's steel segment.

8.      The Debtor produced approximately 4.46 million tons of liquid steel and 3.84 million tons of finished steel products in 2015.  The Debtor manufactures a variety of flat

---

[5]      A certified copy of the Lifting Order in its native Spanish is attached hereto as Exhibit C.  A certified English translation of the Lifting Order is attached hereto as Exhibit  D.

[6]      A certified copy of the Mexican Plan in its native Spanish is attached hereto as Exhibit E.  A certified English translation of the Mexican Plan is attached hereto as Exhibit F.

steel products (such as plate, hot rolled coil, cold rolled coil and tinplate) as well as certain long steel products (such as heavy beams).

9. Historically, the Debtor's principal market for its products has been Mexico, where the Debtor has held a significant market share for flat products since 1998. In the Mexican domestic market, the Debtor's products are used primarily in the construction, manufacturing, petroleum, automotive, packaging, and home appliance industries. The Debtor also exports, directly or through steel traders, to a variety of end users, primarily those in the manufacturing, construction and tubing industries. Export sales in 2015 were 536,000 tons, representing 14% of the Debtor's sales volume of steel products and 13% of the Debtor's net sales of steel products. As of December 31, 2015, the Debtor generated revenue of 41,100 million pesos (i.e., $2,593 million (USD)) and produced EBITDA of 218.97 million pesos (i.e., $15.268 million (USD)).

10. The Debtor's main steel making facilities and corporate offices are located in Monclova, Coahuila, Mexico. These facilities are located close to transportation lines, raw materials supplies, principal points of export and the Debtor's major domestic markets. Furthermore, the Debtor's senior management directs all aspects of the Debtor's operations from the Monclova corporate offices.

11. The Debtor also owns substantially all of its iron and coal mines, all located within 290 kilometers of the Debtor's main steel making facilities. Through its subsidiary Minera del Norte, S.A. de C.V. ("MINOSA"), the Debtor operates three iron ore mines that supplied 89% of the Debtor's iron ore requirements in 2015. In addition, the Debtor operates open pit and underground coal mines that supplied 81% of the Debtor's metallurgical coal requirements in 2015.

12. The Debtor, through MINOSA, is also engaged in the production and sale of steam coal, a key raw material for the electric utility industry. In 2015, MINOSA produced 8.44 million tons of steam coal and sold 6.73 million tons.

13. As of December 31, 2015, the Debtor had 20,435 employees. At that date, approximately 7,367 employees were non-union employees and approximately 12,798 were union employees. The Debtor and its subsidiaries have signed collective bargaining agreements which provide for annual revisions to base salary and biannual adjustments to benefits in accordance with applicable Mexican law. In the past 25 years, neither the Debtor nor any of its subsidiaries has experienced a strike.

## II. *The Debtor's Corporate Structure*

14. Prior to the entry of the Lifting Order approving the Mexican Plan, Grupo Acerero del Norte, S.A. de C.V. ("GAN"), a non-Debtor,[7] was the Debtor's majority parent, owning approximately 76.1% of the Debtor's outstanding common equity.[8] GAN owns a conglomerate of companies operating in the segments of steel mills, chemical, mining and energy. GAN's operations include activities related to the manufacturing of basic raw materials derived from steel, hot rolled strips, structural shapes, light sections, cold rolled sheet, tinplate and tin free steel. GAN is a privately held company, incorporated under the laws of Mexico and its headquarters are based in Mexico City, Mexico.

15. Following the entry of the Lifting Order, the Debtor's corporate structure is now as follows: (a) creditors that made an Equity Election (defined below) collectively own

---

[7] GAN is currently a debtor under the SP Law, petitioning for protection under the SP Law on May 18, 1999. GAN's pending proceeding under the SP Law is separate and distinct from the Debtor's SP Proceeding.

[8] Prior to the entry of the Lifting Order approving the Mexican Plan, approximately 4% of the Debtor's common equity was owned by its officers and directors, and the remaining approximate 20% of the Debtor's common equity, which was publicly traded on the Mexican Stock Exchange prior to the suspension of trading in 1999, was owned by its public stockholders.

26.4% of the Debtor's common equity,[9] (b) GAN owns 57.8% of the Debtor's common equity (exclusive of common equity received by a subsidiary of GAN that made a valid Equity Election with respect to its claims against the Debtor), and (c) the Debtor's officers and directors and public stockholders hold the remaining 15.8%.

16.     The Debtor owns substantially all of the equity of its principal direct and indirect subsidiaries, as depicted in the organizational chart below:



---

9       The issuance of equity to certain of AHMSA's creditors required the approval of the Mexican Federal Competition Commission (the "FCC").  On June 24, 2016, the FCC notified those creditors that the approval for the issuance of the equity expired on June 15, 2016, and that in the view of the FCC, the shares had not been issued prior to such date.  The creditors and the Debtor have submitted a revised application to the FCC.  The percentages listed herein assume that the revised application is approved and that all shares for which Equity Elections were made are issued to creditors.

17.     Substantially all of the Debtor's operations in the United States are conducted through its wholly-owned subsidiary AHMSA International, Inc. ("AHMSA International"), a Delaware corporation.  AHMSA International specializes in the distribution of flat rolled carbon steel, heavy structural shapes and plates used in various applications including fabrication, tubing, pipe, construction and OEM manufacturing industries.

18.     The Debtor also owns substantially all of its iron and coal mines which provide the Debtor with necessary raw materials.  The Debtor's iron and coal mines are operated through its subsidiary MINOSA.  The Debtor's steel distribution primarily takes place through its subsidiary, Nacional de Acero.  In addition, the Debtor's production of steam coal takes place through MINOSA.

19.     All of the Debtor's key corporate functions are managed and performed in Monclova, Coahuila, Mexico, including treasury, corporate finance and accounting, strategic decision making, communications and investor relations, human resources, payroll, information technology, new business development initiatives, pricing and equipment acquisition.  All of the Debtor's key contractual arrangements, including leases, insurance and other key corporate documents, are negotiated, arranged, and maintained in Mexico.  Corporate books and records are also maintained in Mexico.

## III.    *The Debtor's Debt Structure*

20.     Prior to the SP Commencement Date, pursuant to an Indenture dated as of May 6, 1997, the Debtor issued $200 million (USD) of 11 3/8% Series A Senior Notes due April 30, 2002 (the "Series A Notes") and $225 million (USD) of 11 7/8% Series B Senior Notes due April 30, 2004 (the "Series B Notes").  Pursuant to an Indenture dated as of December 16, 1996, the Debtor issued $85 million (USD) of 5.5% Senior Discount Convertible Notes due 2001 (the "Senior Discount Convertible Notes").  Pursuant to a credit agreement dated as of April 11,

1997, the Debtor entered into a syndicated loan for $330 million (USD) structured by Morgan Guaranty Trust Company of New York, which loan consisted of two tranches: (a) Tranche A in the amount of $303 million (USD) due April 16, 2002 and (b) Tranche B in the amount of $27 million (USD) due April 16, 2004.  Pursuant to a credit agreement dated October 17, 1996, the Debtor also obtained a loan from Banco Nacional de México, S.A. for $70 million (USD) due August 11, 2000.  Pursuant to a credit agreement dated as of December 30, 1996, the Debtor obtained another loan from Bank of Tokyo Mitsubishi LTD for $9 million (USD) due October 30, 2001.  Pursuant to a credit agreement dated as of July 22, 1997, the Debtor obtained an additional loan from Banco Nacional de México, S.A. for $50 million (USD) due August 11, 2000.  Pursuant to a certain credit agreement dated as of  September 8, 1997, the Debtor obtained a loan from Bank of America National Trust and Saving Association for $125 million (USD) due July 8, 1999.  Pursuant to a certain Credit Agreement dated January 19, 1998, the debtor obtained a loan from Banco Inverlat, S.A. for $30 million (USD), due January 19, 2001.  Pursuant to a certain Credit Agreement dated March 3, 1998, the debtor obtained a loan from Banco Inverlat, S.A. for $20 million (USD), due March 3, 2001.  Pursuant to a Long Term Trade Finance Facility, the debtor obtained financing from West Merchant Bank Limited for $37.5 million (USD), due June 22, 2003.  Pursuant to a Long Term Trade Finance Facility, the debtor obtained financing from West Merchant Bank Limited for $10 million (USD), due August 28, 2003.  In addition, the Debtor owed approximately $91 million (USD) to various trade vendors, among other debt.[10]  The Debtor had no secured debt.

21.     Following the entry of the Lifting Order, as described further below, Recognized Claims were converted into the Mexican Peso equivalent amount of SP Three-Year

---

[10]     The remainder of the Debtor's debt is comprised of sixty relatively small loans spread amongst a number of counterparties.

Payments (as defined below). In addition, eligible creditors were entitled to make an Equity Election (as defined below) to exchange 69.15% of their SP Three-Year Payments for a combination of cash and common shares in the reorganized Debtor. The net amount of the SP Three-Year Payments issued after giving effect to the Equity Elections is 8,845.7 million pesos.

## IV. *The Debtor's Assets In Delaware*

22.     The Debtor's primary assets in the United States include approximately $20 million in cash which is located in a local bank account in the Debtor's name in Delaware and its 100% equity ownership of (i) AHMSA International, a Delaware corporation, through which the Debtor conducts substantially all of its operations in the United States and (ii) Mexicans & Americans Trading Together, Inc. ("MATT"), also a Delaware corporation. As described in more detail in the Memorandum of Law, pursuant to applicable Delaware law, the stock in AHMSA International and MATT are considered to be located in Delaware for purposes of venue. The aggregate book value of the stock of AHMSA International and MATT is approximately $11,000,000 as of July 31, 2016.

23.     The majority of the Debtor's assets in the United States are located in Delaware.

## V. *Events Leading to Filing for Chapter 15 Relief*

24.     On the SP Commencement Date, the Debtor obtained a judicial declaration of suspension of payments under the SP Law amidst falling steel prices. As a result of filing for protection under SP Law, among other things: (a) the Debtor was granted protection from creditors' attempts to collect on any indebtedness arising out of transactions completed prior to the SP Commencement Date; (b) interest ceased to accrue on all of the Debtor's outstanding unsecured indebtedness; and (c) all of the Debtor's obligations denominated in a currency other than Mexican pesos were deemed converted into Mexican pesos as of the SP

Commencement Date.[11]  In 1999, consistent with the requirements of the SP Law, I was

appointed to serve as the "*síndico*" in connection with the SP Proceeding.  In that role, I assisted

the Mexican Court with the SP Proceeding by taking a preliminary inventory of the Debtor's

assets, prepared quarterly reports submitted to the Mexican Court as to the status of the Debtor,

prepared a provisional list of creditors and filed a report on possible claims of the Debtor.

25.     On July 6, 2000, a meeting of creditors was held in Monclova, Coahuila,

Mexico, at which Bank of America, N.A. was appointed by the creditors to serve as an

"intervenor" to oversee and monitor the actions of (i) the Debtor and (ii) the *síndico*.

26.     During its approximately seventeen years of protection under the SP Law,

the Debtor was involved in complex negotiations regarding the restructuring of its outstanding

indebtedness with groups of its creditors, which ultimately culminated in the Mexican Plan.[12]  In

connection with such negotiations, on November 7, 2014, the Debtor, GAN (as the Debtor's

majority shareholder), and certain funds associated with D.E. Shaw & Co, LLP and Black River

Asset Management LLC (collectively, the "Plan Supporters") entered into a Conditional

Agreement (as amended, the "Conditional Agreement") in order to facilitate the Mexican Plan

and to reduce the Debtor's debt burden upon the lifting of the SP Proceeding.

---

[11]     At the SP Commencement Date, the prevailing exchange rate was 9.5468 pesos to $1.00 (USD).

[12]     As further described in the SP Expert Declaration, the SP Proceeding lasted approximately seventeen years due to a number of different reasons.  One reason, *inter alia*, is that under the SP Law, all claims against a debtor must first be resolved before a meeting of creditors may be called to consider a proposed plan.  The Debtor's restructuring was extremely complex as it involved over nine hundred creditors and approximately $1.7 billion in debt.  This claims resolution process was further complicated by the fact that many of the Debtor's creditors engaged in protracted, time-consuming litigation over their claims (including various appeals to higher courts), which had to first be resolved before the Creditors' Meeting could be held and the Mexican Plan approved.  See SP Expert Declaration at ¶¶ 41-42.  In addition, under the SP Law, if a proposed plan does not garner the required creditor support, the debtor is forced to convert its case to a liquidation.  Accordingly, the Debtor had to negotiate extensively with creditors to ensure that it had adequate support for the Mexican Plan to avoid liquidation of the Debtor.  See SP Expert Declaration at ¶ 43.

27.     The Conditional Agreement required, among other things, that the Debtor seek the Mexican Court's and creditors' approval of the Mexican Plan, which provides for payment to each unsecured creditor of the amount in Mexican Pesos of its Recognized Claims (as defined below) on the third anniversary of the Lifting Date—which payment, under the SP Law, constitutes payment in full satisfaction of all Recognized Claims (as defined below).  The Conditional Agreement also obligated the Debtor and GAN to support a capital increase (the "Capital Increase") required to issue new shares to creditors pursuant to the terms of the Mexican Plan and the Conditional Agreement.  The Plan Supporters also agreed in the Conditional Agreement to support the Mexican Plan and to make Equity Elections (as defined and described below) in the collective amount of 5,613,518,400 pesos.  Under the Conditional Agreement, the Plan Supporters are not entitled to different economic incentives or entitlements under the Mexican Plan than any other similarly situated creditor.  The Plan Supporters will receive the same economic treatment on account of their claims as other similarly situated creditors under the Mexican Plan.[13]

28.     On December 7, 2014, the Debtor filed the Mexican Plan with the Mexican Court, and on December 17, 2015, the Mexican Court entered an order (the "Creditors Meeting Order") scheduling the meeting of creditors (the "Creditors Meeting") where the Debtor's creditors would meet and vote on whether to approve the Mexican Plan.  The Debtor caused notice of the Creditors Meeting to be published in (a) several newspapers in Mexico: the

---

[13]     The Plan Supporters are receiving certain benefits under the Conditional Agreement which are not available to creditors not party to the Conditional Agreement.  Specifically, pursuant to the terms of the Conditional Agreement, the reasonable fees and expenses of the Plan Supporters' professionals which are incurred in connection with certain aspects of the SP Proceeding and this Chapter 15 Case were paid by the Debtor.  The Plan Supporters also agreed to provide releases to certain non-debtor affiliates and received (a) certain releases from GAN and the Debtor for any and all claims which are related to the Debtor's restructuring and (b) certain governance rights with respect to their equity ownership of the Debtor, such as appointment of directors and veto rights over certain corporate actions, each as further described in the Conditional Agreement, which is attached to the Disclosure Statement.

*Diario Oficial de la Federación, El Zócalo, El Norte, Mural, Reforma*, and *El Sol de San Luis*

from February 2 through February 4, 2016 and (b) the *Wall Street Journal* (National Edition) in

the United States on February 18, 2016.  Although not required under SP Law, the Debtor sent

an English language disclosure statement (the "Disclosure Statement") to its U.S. Recognized

Creditors and Noteholders, each as defined below, and launched a publicly available website,

cases.primeclerk.com/AHMSA15, which contained the Disclosure Statement and other

information regarding the Debtor's restructuring.  The Disclosure Statement provided all

required information about the Conditional Agreement, the Mexican Plan, the Debtor's

business, and notice of the Creditors Meeting.  The Debtor sent this disclosure statement to U.S.

Recognized Creditors and Noteholders to ensure that they would receive adequate notice and

information about the Mexican Plan, the Debtor's restructuring and the Creditors Meeting.[14]

The Debtor also established for (a) creditors whom the Company believed was a holder of a

recognized claim that was organized or domiciled in, or a citizen of, the United States of

America ("U.S. Recognized Creditors") and (b) beneficial owners of the Series A Notes, Series

B Notes and Senior Discount Convertible Notes (the "Noteholders") special procedures to vote

on the Mexican Plan and to make Equity Elections that were in addition to those provided to

creditors in general.

       29.     Pursuant to the Creditors Meeting Order, on April 18, 2016, the Creditors

Meeting was held and the Debtor's creditors that held general unsecured claims that have been

recognized by the Mexican Court (each, a "Recognized Claim") voted as a single unsecured

class of creditors to approve the Mexican Plan, which satisfied the Requisite Creditor Consent.

The Debtor was required to have a quorum of at least 51% of all creditors present at the

---

[14]       A copy of this disclosure statement is hereto as Exhibit G.

meeting, and at least one third of all creditors present at the meeting had to vote in favor of its

Mexican Plan, which creditors represent at least 50% of all outstanding debt. This voting

requirement was met, as 435 recognized creditors representing approximately 61% of all of the

Debtor's creditors voted in favor of the Mexican Plan, representing approximately 75.71% of all

outstanding debt. Subsequently, the Mexican Court approved the Mexican Plan by entering the

Lifting Order, which lifted the Debtor's suspension of payments. The Debtor caused notice of

the Lifting Order to be published in the *Diario Oficial de la Federación* from July 6 through

July 8, 2016. Under Mexican law, the time for appeal of the Lifting Order has expired, and on

August 9, 2016, the Debtor commenced distribution of the Election Shares and Election Cash to

those creditors who made a valid Equity Election (as such terms are defined below).

## VI. *The Terms of the Approved Mexican Plan*

30.     In accordance with the SP Law, the Mexican Plan provides for the

payment in full of all holders of Recognized Claims within three years of the Lifting Date (as

defined below). More specifically, pursuant to the Mexican Plan, the Debtor will be required to

pay 8,845.7 million pesos[15] on the third anniversary of the lifting of the SP Proceeding (without

any interest), or May 16, 2019 (the "<u>Lifting Date</u>"), which will be proportionally paid to all

creditors holding a Recognized Claim (the "<u>SP Three-Year Payments</u>", and the right to receive

such payment, the "<u>SP Three-Year Payment Rights</u>"). Pursuant to the Mexican Plan, all debts

that accrued prior to the SP Commencement Date will be novated, and the only obligation of the

Debtor to pay such debts will be to make the SP Three-Year Payments. <u>See</u> Articles 356, 358,

359 and 360 of SP Law. In addition, creditors are not permitted to assign their SP Three-Year

Payment Rights to third parties.

---

[15]     See footnote 9.

31.     The Mexican Plan also provides that holders of the Series A and Senior B Notes will be deemed to have a Recognized Claim equal to the original issue price of such notes, plus accrued original issue discount and accrued and unpaid interest to the SP Commencement Date, and holders of the Discount Notes will receive a recognized unsecured claim equal to the accreted value of such notes plus accrued original issue discount to the SP Commencement Date.  See Articles 296, 304, and 322 of SP Law.  Holders of the Notes will receive the same treatment as all holders of Recognized Claims, described above.  Such treatment of holders of the Notes is considered payment in full under the SP Law.  See Articles 296, 304, and 322 of SP Law.

32.     Additionally, under the Mexican Plan, each eligible creditor was afforded the option (the "Equity Election") to exchange 69.15% of its SP Three-Year Payment Rights received for (a) shares of the Debtor capital stock (the "Election Shares"), with the number of Election Shares determined based on a formula based on the number of Equity Elections submitted, and (b) cash (the "Election Cash").  The final exchange rate was that for each 1,000,000 pesos of SP Three-Year Payment Rights exchanged, the creditor received 15,303.85 Election Shares and US$2,735.55 in Election Cash.  Pro rata payments were made for amounts less than 1,000,000 pesos, and share numbers were rounded to the nearest whole number of shares and Election Cash was rounded to the nearest cent.  Pursuant to the terms of the Conditional Agreement, the Plan Supporters agreed to make the Equity Election in respect of SP Three-Year Payment Rights to be received for 5,613,518,400 pesos of their Recognized Claims.

33.     In general, in order to make a valid Equity Election, creditors were required to attend the Creditors Meeting and make the Equity Election prior to the conclusion of the Creditors Meeting.  Under the special procedures established for U.S. Recognized Creditors

and Noteholders, such U.S. Recognized Creditors and Noteholders were able to make an equity election by submitting appropriate documentation to Prime Clerk, acting as Tabulation Agent, prior to April 11, 2016 at 4:00 p.m.; over thirty such Equity Elections were received. Creditors that did not timely make an Equity Election using one of the preceding methods, waived the right to later make an Equity Election.

34.     Creditors that chose to exercise the Equity Election also retained the remaining 30.85% of their SP Three-Year Payment Rights.

35.     In order to issue the shares to creditors who chose to exercise the Equity Election, on April 17, 2015, the required amount of the Debtor's shareholders agreed to the Capital Increase authorizing the distribution of additional shares to be distributed to creditors who exercised the Equity Election. The new shares authorized under the Capital Increase were deposited with a trustee and distribution to Recognized Creditors who made an Equity Election commenced on August 9, 2016, following such time as the Lifting Order became a final, non-appealable order.

36.     In order to effectuate the Mexican Plan, the Mexican Court authorized the Debtor to seek "approval of this General Payment Agreement [i.e. the Mexican Plan] under the rules of Chapter 15 of the Bankruptcy Code of the United States of America." Mexican Plan at Clause 8.

## VII.     *The Lifting Order*

37.     The Lifting Order was entered on May 16, 2016 by the Mexican Court.[16] The Lifting Order approved the terms of the Mexican Plan and authorized the Debtor to

---

[16]     A certified English translation of the Lifting Order is attached hereto as <u>Exhibit D</u>.

consummate all transactions contemplated by the Plan, including, without limitation, any transactions required to give effect to the Equity Elections.

38. The Mexican Plan and the Lifting Order discharges the Debtor's obligations to pay the Recognized Claims (and provides for an injunction against creditors attempting to collect upon such discharged Recognized Claims) but also simultaneously obligates the Debtor to make the SP Three-Year Payments to the holders of Recognized Claims. <u>See</u> Articles 356, 358, 359 and 360 of SP Law. Stated otherwise, while the Debtor was discharged of one debt (the obligation to pay the Recognized Claims), it also incurred another debt (the obligation to pay the SP Three-Year Payments) under the Mexican Plan. Under the SP Law, if the Debtor fails to pay the SP Three-Year Payments in full within three years from the Lifting Date, not only will creditors have the right to collect on the SP Three-Year Payments owed, but the Debtor will also be forced into liquidation. <u>See</u> Articles 369-372 of SP Law. Pursuant to both the Lifting Order and the Mexican Plan, an injunction was issued preventing any creditor from attempting to collect on account of (a) the SP Three-Year Payments before such payments are due, or (b) their Recognized Claims.

39. Significantly, the Lifting Order authorizes me to effectuate the Mexican Plan, including obtaining "validation of this judgment abroad as referenced in Clauses Four and Eight of the [Mexican Plan]." Lifting Order at p. 83 of 87, <u>see also</u> <u>Id.</u> at p. 84 of 87, clause 4.

## VIII. *Appointment Resolution*

40. On August 3, 2016, the Mexican Court issued a resolution formally appointing me as the foreign representative of the Debtor in any case to be commenced for the Debtor under chapter 15 of the Bankruptcy Code (the "<u>Appointment Resolution</u>").[17]

---

[17] A copy of the Appointment Resolution is attached hereto as <u>Exhibit H</u> and a certified translation from Spanish to English is attached hereto as <u>Exhibit I</u>.

## IX.  *Commencement of the Chapter 15 Case*

41.     Now that the Lifting Order has been entered by the Mexican Court, the three-day appeals period with respect to the Mexican Plan having expired,[18] and I have been appointed to serve as the Foreign Representative in the Chapter 15 Case, I commenced this chapter 15 case to seek recognition of the SP Proceeding and enforcement of the provisions of the Lifting Order in the United States, to ensure, among other things, that the Mexican Plan and the Lifting Order's provisions are effective with respect to the Debtor's U.S. assets and creditors.

## REQUEST FOR RECOGNITION AND RELATED RELIEF

42.     In connection with the commencement of this Chapter 15 Case, I have submitted the Verified Petition, which seeks entry of an order: (a) recognizing the SP Proceeding as the foreign main proceeding for the Debtor pursuant to section 1517 of the Bankruptcy Code; (b) automatic relief as of right upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code, including, but not limited to, the automatic stay provided for by section 362 of the Bankruptcy Code; (c) recognizing me as the "foreign representative" of this Chapter 15 Case; (d) giving full force and effect in the United States to the Mexican Plan and the Lifting Order; (e) as provided in the Mexican Plan as approved by the Lifting Order, permanently enjoining all persons from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtor

---

[18]     Dissenting creditors and the *Sindico* have three months after the publication of the approval of the Mexican Plan to file a separate lawsuit for the Mexican Plan to be declared invalid or null on certain limited grounds, including that fraudulent transfers or fraudulent votes occurred, that creditors were not sufficiently represented by counsel, that proper publication of the meeting of creditors was not complied with or that any other technical requirement was not met by AHMSA.  As the Debtor caused the Lifting Order to be published from July 6-8, 2016, this three-month period will expire on October 8, 2016.

or its property located in the United States; and (f) granting such other and further relief as the Court deems just and proper.

43.     As set forth in the Verified Petition, this Court should recognize the SP Proceeding as a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code. The SP Proceeding is a collective judicial proceeding authorized and supervised by the Mexican Court under the SP Law and pursuant to the SP Commencement Order. The SP Proceeding is a restructuring case in which all stakeholders of the Debtor are permitted to participate and the Mexican Plan establishes a framework to resolve all of the Debtor's recognized pre-filing liabilities. Additionally, adequate notice was given to creditors pursuant to the terms of the SP Law, the Mexican Plan proposes to distribute the Debtor's assets in accordance with the priorities of the SP Law, and creditors have had and have the opportunity to be heard before the Mexican Court and seek appeals of decisions of the Mexican Court in accordance with Mexican law. It is my understanding that for these reasons, the SP Proceeding qualifies as a "foreign proceeding" as that term is defined in section 101(23) of the Bankruptcy Code.

44.     In addition, this Chapter 15 Case has been commenced by a duly-authorized foreign representative pursuant to the Appointment Resolution. It is my understanding that since I have been "authorized" to act as a representative of the SP Proceeding by the Mexican Court, I satisfy the definition of a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code.

45.     The role of a *síndico* in a case under the SP Law is to oversee the acts of the debtor company to ensure that its assets are being used in a manner beneficial to the estate.

A *síndico* is required to file a quarterly report with the court which informs the court and creditors of the debtor company's activities.

46.     I have significant experience serving as a *síndico* in cases under the SP Law, having been appointed as the first *síndico* in Mexico in 1987, and having served as *síndico* in more than 2,000 cases under the SP Law.

47.     In my role as *síndico* in the SP Proceeding, I have been very involved in the Debtor's restructuring process. At the Creditors Meeting, I gave my opinion that creditors should vote in support of the Mexican Plan and tallied the votes cast at the Creditors Meeting. I was required to sign the Mexican Plan in front of the Mexican Court along with the chairman of the board of directors of the Debtor. My role as *síndico* will continue until the Debtor makes the SP Three-Year Payments in full, and I will be responsible for (a) monitoring the Debtor, (b) ensuring that the Debtor performs all actions required under the Mexican Plan, and (c) denouncing the Debtor to the Mexican Court if I become aware of any inappropriate activity on the part of the Debtor.

48.     Recognition of the Lifting Order and the Mexican Plan will ensure the fair and efficient administration of the SP Proceeding, which aims to protect all parties in interest and to require that all the Debtor's creditors be bound by the terms of the Mexican Plan, as approved by the Lifting Order. Without this relief, certain creditors may file actions in the United States against the Debtor seeking to obtain more than the treatment to which they are entitled under the terms of the Mexican Plan. As explained herein, the Debtor has significant assets in the United States,[19] and failure to promptly enjoin creditor actions would result in a significant disruption to the Debtor's business if its creditors can effectively evade the terms of

---

[19]     See supra ¶ 22.

the Mexican Plan and the Lifting Order by commencing actions in the United States. If actions were commenced in the United States, the Debtor would be forced to expend its resources to defend against these suits, regardless of their merit. This could deplete the funds of the Debtor's restructured business and prejudice its reorganized value. The injunctive relief sought in the Verified Petition gives effect to the Lifting Order and the Mexican Plan and will not cause any undue hardship or prejudice to the rights of any of the Debtor's creditors in the United States or elsewhere.

49. As set forth more explicitly below, all of the Debtor's principal corporate, management, banking, and strategic functions are undertaken in Monclova, Coahuila, Mexico, and the Mexican and United States operations are entirely integrated and directed from Mexico. More specifically,

   a. The location of the registered office and corporate headquarters for the Debtor is in Monclova;

   b. All key strategic and operating decisions for the Debtor and its operating subsidiaries are made at the Debtor's main office in Monclova;

   c. Virtually all key senior management are located in Monclova, including the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, the Director of Sales and Marketing, the Director of Financial Planning & Projects, Director of Personnel, and other principal officers of the Debtor;

   d. All key and strategic corporate functions are performed in Monclova, including, but not limited to, treasury, corporate finance and accounting, communications and investor relations, human resources, information technology and new business development;

   e. All books, records and key documents (including contracts, leases, insurance and other key corporate documents) are negotiated and maintained in Mexico;

   f. Payroll functions, accounts receivable and accounts payable for the Debtor are managed from Monclova;

g. The Debtor's stock was registered and publicly traded on the Mexican Stock Exchange, but trading of the stock is currently suspended due to the pendency of the SP Proceeding;

h. The majority of the directors and officers of the Debtor are Mexican residents, and board meetings are typically held in Mexico; and

i. The majority of the Debtor's shareholders (including GAN) are located in Mexico.

Based on these facts, it is my understanding that the Debtor's "center of main interest" is in Mexico and the SP Proceeding is therefore a foreign main proceeding as that term is defined in section 1517(b)(1) of the Bankruptcy Code.

50.     To the best of my knowledge, there are no pending insolvency proceedings with respect to the Debtor other than the SP Proceeding. Accordingly, the SP Proceeding is the only "foreign proceeding," as such term is defined in 11 U.S.C. § 101(23), pending with respect to the Debtor.

## REQUESTS FOR PROVISIONAL RELIEF

### A.  Provisional Relief Motion

51.     I have also submitted, concurrently herewith, the Provisional Relief Motion seeking an interim stay of execution against the Debtor's assets and applying section 362 of the Bankruptcy Code to this Chapter 15 Case on an interim basis, pursuant to sections 105(a), 1519(a) and 1521(a)(7) of the Bankruptcy Code. As set forth in more detail in the Provisional Relief Motion, the Foreign Representative is seeking the provisional relief because it is necessary to avoid irreparable harm.

52.     I further believe that the entry of an order granting provisional relief will not harm the Debtor's creditors. The provisional relief will be in place for only a short time, and affected parties would be able to seek relief, if necessary, from this Court. Accordingly, I believe that the balance of harms weighs in favor of granting the provisional relief.

**B. Notice Procedures Motion**

53.     The relief sought in the Notice Procedures Motion is warranted in this Chapter 15 Case.  The Debtor has hundreds of creditors, potential creditors, and other parties in interest, all of which will need to be provided with notice of, among other things, the filing of this Chapter 15 Case, the order on the Provisional Relief Motion, the deadline to object to recognition of this Chapter 15 Case, and the hearing date for recognition of this Chapter 15 Case.  I believe the notice procedures set forth in the Notice Procedures Motion represent a cost-effective method for the Foreign Representative to effectively handle service in this Chapter 15 Case.  Accordingly, I believe entry of an order granting the relief requested in the Notice Procedures Motion is in the best interest of the Debtor and all parties in interest.

## CONCLUSION

Based on the foregoing, I believe that the relief requested in the Debtor's ancillary Chapter 15 Case is well-justified, necessary under the circumstances, in the best interests of the Debtor and its creditors and should be granted in full.

[*Signature Page Follows*]

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: August 16, 2016

Respectfully submitted,

_____

Francisco Javier Gaxiola Fernández
*Síndico* in SP Proceeding and Authorized Foreign
Representative

01:19096932.2